# Snow *v.* Bray, *et al.*

### Ejectment.

(Decided May 11, 1916.   Rehearing denied December 30, 1916.
73 South. 542.)

1. **Adverse Possession; Continuity.**—Continuity of possession is one of the essential elements of adverse possession.

2. **Same; Actual Possession; Jury Question.**—Where a land company exercised a general supervision of land, such as showing purchasers over it, its adverse possession thereof was a question for the jury.

3. **Same; Agent's Possession.**—Where a land company sold a lot to an agent and such agent supervised the remaining lots and tract for the land company the possession by the agent of his lot had no effect upon the remaining property as to which he made no claim.

4. **Same; Cutting Timber.**—Cutting timber on land on rare occasions is not sufficient to establish adverse possession.

5. **Same; Color of Title.**—Where the evidence was in conflict as to whether a deed to a predecessor in title of the defendant had been altered before or after delivery it was for the jury to determine its effect upon the title.

6. **Same; Actual Possession; Using Timber.**—The occasional using of firewood and the removal of a fence on a tract of land does not establish adverse possession of it.

7. **Judgment; Conclusiveness.**—Where the action was ejectment the record in a suit to enforce a vendor's lien against certain lands, including the lands involved in the ejectment suit, but in which other lands were decreed to be first sold, and in fact were sold for an amount sufficient to satisfy the lien was not admissible.

8. **Adverse Possession; Actual Possession; Color of Title.**—Color of title without actual possession for the statutory period is not sufficient to establish title by adverse possession.

9. **Ejectment; Diclaimer by Relatives; Evidence.**—Where the action was ejectment it was error to admit testimony of the brother and sister of the plaintiff that they claimed no interest in the property.

[Snow v. Bray, et al.]

10. **Executors and Administrators; Sale by; Validity.**—The purchase of realty by an administrator from the estate of his decedent is void where the report of sale was endorsed by the clerk of the probate court as approved but there was no decree affirming such sale nor any deed executed by a commissioner to a purchaser.

11. **Adverse Possession; Continuity of Use.**—Prescription and presumption indulged with reference thereto are based upon the continuous use of real estate.

12. **Ejectment; Equitable Defenses.**—A defense that defendant's predecessor in title obtained an equity in the land by an attempted purchase from the estate of which he was administrator and that he accounted for the consideration thereof is not available in an action of ejectment.

13. **Executors and Administrators; Sale; Power.**—A void sale by an administrator under an order of court cannot be supported as an exercise of a power of sale under the will.

14. **Same; Who May Exercise.**—Where the power devised to the executor involved a discretion to be exercised as to the sale an administrator de bonis non with the will annexed cannot exercise the power of sale contained in the will under § 3437, Code 1907.

APPEAL from Birmingham City Court.

Heard before Hon. JOHN C. PUGH.

Ejectment by Mary A. Snow against J. A. Bray and others. Judgment for the defendants and plaintiff appeals. Reversed and remanded.

A. LATADY and ETHERIDGE & LAMAR, for appellant. HARSH, HARSH & HARSH, NATHAN L. MILLER and NEEDHAM J. GRAHAM, JR., for appellees.

SAYRE, J.—Statutory action in the nature of ejectment by appellant against appellees for the recovery of the east half of the southwest quarter of the southeast quarter of section 12, township 18 south, range 4 west of the Huntsville Meridian. By disclaimers and pleas, the controversy between plaintiff and the several defendants was limited in the case of each defendant to certain lots they had purchased from the Monte Sano Company according to a plat or map of an inclusive 100-acre tract, showing a division of the entire tract into several hundred lots. The Monte Sano Company had purchased the inclusive tract in the summer of 1902, and the evidence went to show that about the same time it had caused the property to be surveyed and laid off into streets, avenues, blocks, and lots, as shown by the map, the streets and avenues running entirely across the property; that each street, avenue, block, and lot was marked by stobs, signs,

and numbers; that the timber was cut and removed from the streets and avenues; that some slight grading was done in the streets and avenues, some of the stobs and some signs of the grading being visible upon the land at the time of the trial, but at that time small growth had appeared in the streets and avenues; that it caused a sink hole on the property to be drained; that a sign, four or five feet square, was placed on the tract near the car line advertising the lots for sale; that in September, 1902, the Monte Sano Company sold a lot to one Scott, who began immediately to build, and moved upon the lot in October of the same year, after which, and until his death in 1910, he exercised "a general supervision" for the company over all the property; that the company began in the same year to advertise and offer the lots for sale, its agents going upon the land with prospective purchasers frequently from time to time; but the car line, Scott's residence, the sign, and the sink hole, were on a part of the 100-acre tract other than the 20 acres described in the complaint. A number of houses had been built by purchasers on parts of the survey other than the 20 acres. Other purchasers had built and occupied houses on the 20 acres, and some had let their houses to rent; those persons actually residing on the land at the time of the commencement of this suit, some 16. in number, being named as the original parties defendant. The oldest of the houses on the tract, except Scott's, appear to have been built five or six years before suit brought, and, unquestionably, during that time defendants, who occupied these houses, had held their several purchases adversely to all the world.

Defendants had the general charge, and verdict and judgment accordingly, in the court below; and the main question presented by the record is whether the evidence showed without conflict or reasonable adverse inference that the Monte Sano Company held continuous adverse possession during the period from 1902 down to the purchase of their respective lots by defendants so that, by tacking the two possessions, defendants made out a title by adverse possession for the statutory period of ten years. We state the question in this form for the reason that this in our judgment is the statement of the case most favorable to the trial court's conclusion that as matter of law on the uncontradicted evidence, if accepted by the jury, defendants were entitled to prevail. Plaintiff claimed, of course, a present possessory interest in the land, and could not maintain her action on proof of any

different interest. She offered in evidence the last will and testament of her father, who had died in the undisputed owner-ship and possession of a large body of land that included all the land to which we have referred. The will devised all the testa-tor's real property to his widow "during her natural life or widowhood or the youngest child arrives at lawful age." The next clause of the will provided as follows: "It is my will and desire and I hereby direct that my property be kept together until my youngest child arrives at full age, unless my wife Rebecca, die or marry another man, then upon the happening of any of the aforesaid circumstances, I wish my executor to sell my property as hereinafter directed."

The direction referred to was expressed in this language: "I wish my executor to sell my real estate, either together or in such divisions and subdivisions as will be likely to command the greatest prices and divide the money arising from such sale among the children."

Plaintiff then introduced the record of the probate court show-ing that the widow had dissented from the will, and that, in lieu of the provisions made for her by the will, dower had been assigned to her. This assignment included 80 acres of the 100-acre tract claimed by the Monte Sano Company, but not the 20-acre tract described in the complaint which is contiguous to it on the west. It appeared in the course of the trial that Laird, plaintiff's father, died in 1876, leaving a widow and 12 children, some of whom, plaintiff among them, were minors at that time. Two years later the widow married one Tulley. In the meantime the will had been probated and dower assigned. The executor named in the will appears to have entered upon the execution of his trust, but did nothing of any consequence here. In 1877, M. M. Gwin was acting as administrator de bonis non with the will annexed. His authority is not denied. On March 3, 1881, Gwin's account as upon a final settlement was passed and allowed in the probate court. Upon these facts, some of them drawn from the evidence offered by defendants, plaintiff's prima facie case has not been denied; the theory being, as we infer, that, since the land was not devised as land to testator's children, the title, after the widow's dissent, descended to his heirs and has remained in them subject only to the dower assigned and to inter-ception by a personal representative for the purpose of paying debts or for distribution as personalty under the will. We con-

sider, therefore, the claim of defendants as presented in the brief of counsel.

(1-3) Defendants (appellees) seek to justify the general charge in the court below on several grounds. For one, they say that any interest plaintiff may have had in the land has been divested by the adverse possession of themselves and those under whom they claim for a period of ten consecutive years or more. That defendants have been in possession, holding adversely, since they improved and occupied their several lots, there can be no question; nor can it be doubted that the Monte Sano Company was in possession in the summer of 1902. The things they did then were quite demonstrative as acts of ownership. But the interval of four or five years is not at all so accounted for as to show conclusively and as matter of law notice to plaintiff, though she was all the while cognizant of the condition of the property, that the Monte Sano Company was still in possession under an adverse claim of ownership. Scott's possession of a lot can avail defendants nothing. He derived his title from the company, but he held for himself. He was not a tenant holding for his vendor, but as owner holding in his own right. His possession had no effect upon the remainder of the property to which he laid no claim. On the evidence, the substance of which has been stated so far as it bore upon the possession claimed by the company, the question of plaintiff's title was not properly withdrawn from the jury by the general charge given at the request of defendants.—*Elyton Land Co. v. Denny*, 108 Ala. 553, and cases cited on page 562, 18 South. 561. Continuity is as essential as any other element of adverse possession. Indeed, "the continuity of the adverse possession is the very essence of the doctrine and policy of the statutes of limitation," for "whenever a party quits the possession the seisin of the true owner is restored, and a subsequent wrongful entry constitutes a new disseisin."—*Henry v. Brown*, 143 Ala. 446, 39 South. 325. It is familiar doctrine, too, that, while the fact that at times there may be no actual possession does not necessarily destroy continuity, the inference of continuity must be rested upon proof of acts of possession naturally indicating continuity of claim (*Hollingsworth v. Walker*, 98 Ala. 543, 13 South. 6), considered in connection with the lapse of time allowed to intervene between successive acts (*Farley v. Smith*, 39 Ala. 38), and is generally a question for the jury. The question debatable in this case was whether, during the four or

five years intervening between the summer of 1902 and the improvement of the lots claimed by defendants, the Monte Sano Company—to employ the language of GIBSON, J., in *Stephens v. Leach,* 19 Pa. 262—kept its flag flying and presented at all times a hostile front to the owner of the true title. Whatever may have been in the mind of the company, it must be judged by its acts. Our judgment is that, whatever conclusion the jury may have drawn, in the circumstances here shown, notice to the plaintiff of the company's adverse claim during the period mentioned was not to be inferred as matter of law from the mere generalization that its agent Scott exercised "a general supervision" over the property. Correct principle and the authority of our cases required that the question be submitted to the jury.

(4-6) Nor was adverse possession for any continuous period of ten years shown prior to the purchase by the Monte Sano Company, the cutting of timber on some rare occasions during that antecedent time by the company's predecessors (other than Tulley) in the chain of paper title under which they claimed being wholly insufficient for that purpose. This chain of title led back to Gwin, the administrator, and had its beginning in a deed executed by Gwin to Tulley, widow Laird's second husband, of date July 25, 1878. That this deed, the original of which we have before us, had suffered material alterations from its original draft is clear. Without the alterations it had no relation to the property described in the complaint; and with them its effect in facie was uncertain, since, purporting to convey lands in section 12 along with lands in section 7, it described the body of lands as lying in ranges 3 and 4. But this uncertainty was, we think made sufficiently certain by evidence from other sources. However the evidence as to whether this deed had been changed before or after delivery was in conflict and this made the question of its effect upon the title conceding for the moment that the title then rested in the grantor a question for the jury; the deed and the evidence touching its condition at the time of delivery having been properly admitted. But in fact Gwin had no title. He had no deed, and had never been in possession except as administrator, and that for a short time only. In February, 1880, Tulley, at a sale made in pursuance of a decree of the chancery court, became the purchaser of the reversion in that part of the Laird lands which had been assigned to the widow as dower, and he and his wife continued to live in the Laird home-

stead, which was located upon the dower lands, until his death in 1886. In 1884, Tulley and his wife joined in a conveyance to H. F. De Bardeleben of the 100-acre tract, and the interest thus acquired by De Bardeleben passed by mesne conveyances ultimately to the Monte Sano Company, less a right of way acquired by the car line about 1890. Eighty acres of this tract went from the dower lands. The land described in the complaint constituted the other 20. The acts of Tulley in the interval between Gwin's deed to him and his deed to De Bardeleben, his occasional getting of rails and firewood from the 20-acre tract, and his removal of a fence that had inclosed a small part of it, however clearly they may have given intermittent indications of a purpose to claim title and assert dominion over the property, did not, without more, satisfy the law of title by adverse possession even during that limited time.—*Rucker v. Jackson,* 180 Ala. 109, 60 South. 139, Ann. Cas. 1915C, 1058. Tulley had only color of title to the 20-acre tract, and, under the evidence, the bona fides of his color was a question for the jury.—*Tapia v. Williams,* 172 Ala. 18, 54 South. 613; *Dodge v. Irvington Land Co.,* 158 Ala. 91, 48 South. 383, 22 L. R. A. (N. S.) 1100. In 1884, Gwin executed to him another deed for the recited purpose of correcting errors in the first; but this did not change the meaning of the color, which was still a question for the jury; and it may be noted, in anticipation of another question to be considered, that this last deed was executed after Gwin's final settlement of his administration.

(7) The record of the chancery proceeding was erroneously admitted in evidence. The bill in that case sought to enforce a vendor's lien against a part of the body of lands of which Laird died seised and possessed, including the land described in the complaint in this action; but the sale of the reversion in the dower lands, which, as we have pointed out, did not include the land in suit, produced enough to satisfy the lien, that interest being first offered as the decree directed. It resulted that the decree and its execution by sale had no effect upon the title of the land here in suit. Whether the error in admitting this record would have called for a reversal, had the issues been submitted to the jury, we need not say. It is enough to say, on the record presented, that the question whether Tulley's acts of dominion over the 20-acre tract during the interval last above mentioned was to be aided by his residence on the adjoining dower lands under

[Snow v. Bray, et al.]

the peculiar circumstances disclosed by the proof, and whether with that aid it amounted to an adverse holding, was a question for the jury, because, at least, his color of title was such a question, and in any event it is to be noted that his possession was for a time considerably less than ten years.

(8) We see no reason for doubting the good faith of the color of title acquired by De Bardeleben and transmitted through mesne conveyances to the Monte Sano Company. The deeds under which they claimed, so far as they purported to convey the land in suit, were, however, nothing more than color of title, and as color availed defendants nothing, for it is clear, under the evidence and the doctrine of the cases which permit the divestiture of an outstanding title by the colorable extension of an actual continuous holding, that none of the company's predecessors ever for any continuous period of ten years had any such possession of the dower lands they had purchased as would have divested plaintiff of her title, if extended by color to the land in suit. On the foregoing view of the case defendants were not entitled to the general charge.

(9) There was also reversible error in allowing plaintiff's brother and sister to testify that they laid no claims to any interest in the property. Their renunciation of title, upon whatever implied estimate of the right of the case or other undisclosed consideration based, was in no sense binding upon plaintiff, and testimony as to it might have proved highly prejudicial to her cause had it been submitted to the jury for their decision as upon a disputed issue of fact.

(10) Defendants seek further to sustain the action of the court in giving the general charge by reference to the doctrine of prescription. This theory of the case is rested upon an asserted equity in Gwin, through whom defendants claim as has appeared above, and upon the asserted adverse possession by defendants and their predecessors in title to which we have already referred. In aid of this theory, certain proceedings in the probate court were offered in evidence. The record of those proceedings, as for any effect they had upon the title to the land in question, is fatally defective. Gwin, the administrator, petitioned the court to order a sale of the lands of decedent Laird, other than the part assigned to the widow as dower, for the payment of the debts of deceased. A sale was ordered. The administrator reported his execution of the order and that Amos Vines

had purchased 120 acres and had complied with the terms of sale. He also reported that he for himself had made the highest and best bid for other 120 acres, including the land in suit, and was ready and willing to be charged with the sum he had bid. On the back of this report of sale was indorsed the following:

"Filed in office of the judge probate court, approved and ordered recorded and sale confirmed, this 26th day of February, 1878. John C. Morrow, Judge Probate Court."

This indorsement was in the handwriting of the judge's clerk. The probate record introduced in evidence showed an order and decree of the court which, referring to the order of sale, reciting the court's examination of the report of sale, and its satisfaction with the sale reported, confirmed the sale and ordered a deed to Vines. This is the whole substance of the probate record. The decree says nothing in respect of the sale to the administrator. We cannot think that the clerk's indorsement amounted to anything as evidencing action by the court, and, besides, it has long been settled that, where the personal representative purchases at his own sale, in the subsequent proceedings to get a deed he is regarded as acting in his capacity as purchaser, not as personal representative; for himself, not his trust; and that no title passes until, after notice to the heirs or devisees, a deed is ordered and executed by a commissioner of the court's appointment. By the proceeding shown on the record of the probate court Gwin got no title nor any evidence of title. On this point we need do no more than cite the cases to be found in the annotation to section 2644 of the Code.

(11) Prescription operates to maintain a present status of apparent right or title that parties in adversary interest have negligently allowed to continue without interruption for 20 years. Presumptions necessary to maintain the status are indulged, but, in cases involving the title to lands, they must be based upon a continuous adverse use. All our cases on the subject recognize this as the true basis of the doctrine of prescription. The contention that a deed from the probate court to Gwin should be presumed after so long a time seems to be most confidently placed upon the possession of defendants and the alleged possession of their predecessors in claim. If the issue were simply one between plaintiff's undisputed inheritance and defendants' paper title, unaffected by any use or enjoyment of the property, unquestionably the status to be preserved would be that of the inherit-

ance.   Defendants have no title to the land in suit under the
statute of grants, but only color of title.  Color is a fiction adopted
to extend an actual possession, and without possession it avails
nothing.—*Crowder v. T. C. I. Co.*, 162 Ala. 151, 50 South. 230,
136 Am. St. Rep. 17.  The right of defendants depended, there-
fore, upon possession of some part of the Monte Sano Company
tract, so to speak of the whole body of land claimed by the com-
pany and the visible, exclusive, and continuous character of that
possession.   But in no event could the prescriptive presumption
which arises out of possession be of any service to defendants,
since a possession which would entitle them to the benefit of the
presumption of a grant would, without its aid, suffice under the
statute of limitations, to vest title in them or those under whom
they claim.—*Echols v. Hubbard*, 90 Ala. 309, 7 South. 817.  And
in this case, on the evidence, the effect of the acts of ownership
shown on behalf of defendants was upon the whole, as we have
said, a question for the jury.

Defendants rely upon *Marston v. Rowe*, 43 Ala. 271, as going
to show that continuity should be presumed.   That was a suit in
chancery, and, as we read the case, the court proceeded on the
following facts, to state them briefly:  Dexter, under whom
Marston claimed by mesne conveyances, had an equity in a tract
of land, having advanced to one Collins the money for its pur-
chase from the government with an understanding that he was
to have a bond for title as security, and in satisfaction of that
equity had been put in possession of a part of the tract as owner
by Collins after he got his patent from the government.   Rowe
claimed by purchase at a sale under execution against the devisees
of Collins.   The devise, we infer from the statement of the case,
was of testator's right, claim, and interest in the tract described
in the patent.   Dexter divided the part thus delivered to him into
lots something after the fashion of the Monte Sano Company in
this case.   Fourteen years later, Dexter's grantee, who stood in
the chain of title ahead of Marston, was in possession.   These
possessions were not shown to have been continuous in fact, as
the court conceded in effect; but for more than twenty years
after the delivery of possession to Dexter the devisees remained
out of possession, and, with full knowledge of the facts, had done
nothing by way of asserting any claim to the property.   On the
contrary, in speaking of the property, they admitted that it was
Dexter's.   Although Rowe had been in possession for six or

seven years at the time Marston filed his bill, the court held that Marston had the better right, that by laches the devisees had lost any title they may have had in the property. We do not perceive why the decision might not have been also put upon the ground that Rowe's predecessors had taken no interest in the property under the will, and, indeed, the reasoning of the opinion shows that this theory of the case had a place in the minds of the court, though, more specifically the ruling was put upon the doctrine of laches. Considering Dexter's equity and the delivery of actual possession to him, it would seem that the court, when making its general statement in reference to the presumption of continuity, presumed only a continuation of the status of rights thus shown; no entry by the devisees having been shown until twenty years had elapsed. Certainly no continuous adverse holding, according to generally accepted statements of continuity, was shown, nor could any have been presumed, on the court's most clearly expressed theory of the case, except in favor of Marston's clear and long acknowledged equitable, if not legal, title. . *Marston v. Rowe*, which we have thus stated at some length because defendants have placed store by it in more than one aspect of the case in hand, has been cited two or three times by this court in cases which involved no departure from the general rule as to the continuity of adverse possession necessary to be shown in order to confer legal title.

(12) Defendants contend further that Gwin acquired an equity in the land in dispute by accounting for the amount of his bid for the land on final settlement and distributing the net balance then on hand among the children according to the decree of the probate court. His account, filed in the probate court, tends to sustain his contention as to the facts, though, perhaps, not so clearly as it ought. But whatever force the suggestion might have in a court of equity, our cases hold that the estoppel thus invoked could invest in Gwin nothing more than an equity of which a court of law will take no cognizance in an action of ejectment instituted to try only the legal title.—*Woods v. Montevallo Coal Co.*, 84 Ala. 560, 3 South. 475, 5 Am. St. R. 393; *Standifer v. Swann-Billups,* 78 Ala. 88.

In view of defendants' citation of *Lacey v. Southern Mineral Land Co.*, 180 Ala. 57, 60 South. 283, in connection with their insistence upon the presumption of a deed to Gwin, it may be well to state our opinion that no such presumption is raised by the

record of the proceedings of the probate court.   Any proceeding by the administrator for a deed to himself must have been a court proceeding, and at least the invocation of jurisdiction to that end and the resulting judgment or decree must be shown by the record.   All reasonable intendments in the way of interpretation must be indulged in favor of the record, and, when it appears that jurisdiction to make a decree has been invoked and a responsive decree made, intermediate steps in the due course of procedure will be presumed on the maxim that all things are presumed to have been rightly and regularly done.   But in application this maxim has necessary limitations.   Things necessary to constitute a record must be shown by the record and by the record alone.   Here there was no decree ordering a deed to Gwin, nor, for that matter, any deed.   The deed might be presumed, if necessary in order to maintain a long existing status of possession, had that been made to appear; but neither the decree nor the deed can be supplied by mere lapse of time.   In *Lacey's Case, supra,* complainant held under a deed from the assignee in bankruptcy, and the presumption of its regularity and consequent validity rested upon a different state of facts from that here shown and was indulged in respect of a proceeding the validity of which was not hedged about by any such considerations or requirements as obtain in a case where the administrator undertakes to purchase property at a sale conducted by himself.   In that case the court had acquired jurisdiction to deal with the bankrupt estate, the assignee had executed a deed purporting to be made in due course of bankruptcy proceedings, and the presumption was that intermediate steps had been properly taken; whereas here, in a case where the deed must have come from the court itself, the proposition is, not that proceedings merely preliminary or intermediate, but that the deed itself, as well as the essential preliminary decree, should be presumed.   We think it cannot be maintained.

Plaintiff appropriately put in evidence so much of the probate record as proved the widow's dissent from the will and the assignment of dower, this to show that the widow had been divested of any right to the possession of the rest of testator's land; but, so far as we have been able to see, the remainder of that record had no proper place in the evidence, since it was manifestly insufficient for the purpose for which it was offered by defendants.

[Snow v. Bray, et al.]

(13, 14) In the last place, it is argued that the administrator had a power to sell under the will as affected by section 3437 of the Code, and that his execution of a deed to Tulley should be taken as an execution of the power. There are two answers to the suggestion: (1) It does not appear that he intended to execute the power.—*Cramton v. Rutledge,* 157 Ala. 141, 47 South. 214. If he had the power now claimed, then the probate court was without jurisdiction in the premises.—*Wilson v. Holt,* 83 Ala. 528, 3 South. 321, 3 Am. St. Rep. 768. Gwin evidently did not construe the will as conferring power on him. Hence his application to the probate court. (2) As administrator de bonis non with the will annexed, he in fact had no power, for the reason that the power devised to the executor Snow involved a discretion to be exercised as to the manner of sale and that without the security of a bond—a discretion not so broad as some we have seen conferred by wills, but enough to indicate personal confidence and trust, and therefore not passing to the administrator de bonis non, under section 3437 of the Code.—*Tarver v. Haines,* 55 Ala. 503; *Mitchell v. Spence,* 62 Ala. 450.

The best consideration we have been able to give the case leads us to conclude that the charge given by the trial court did not follow the law, and for that and the other reasons indicated the judgment is reversed, and the cause remanded for another trial.

Reversed and remanded.

ANDERSON, C. J., and MCCLELLAN and GARDNER, JJ., concur.

## ON REHEARING.

SAYRE, J.—The brief for appellees and the authorities cited thereon had due consideration on the original submission. On reconsideration of the case, we have found no reason to change our opinion. In view, however, of a suggestion, made for the first time on this application, concerning the admissibility of the testimony of plaintiff's brother and sister that they laid no claim to the property in suit, we think it well to add that, if appellees had acquired by conveyances the interests which descended to these witnesses and sought to exclude such interests from the operation and effect of any possible verdict and judgment in favor of appellant, the conveyances should have been offered in evidence and followed up by a request for appropriate instruction

to the jury. But on the case made by the record the right of appellees depended entirely upon their asserted title by adverse possession. As against appellant, such title could not be shown by the admissions of her cotenants. Their admissions conveyed no title, nor were they evidence of title. If they knew any facts tending to show appellees' title by adverse possession, they should have been asked to state the facts. Appellant was entitled to have a legal decision between her title by inheritance and the title by adverse possession asserted by appellees, and in submitting her case to the jury she should not have been embarrassed by the highly prejudicial, though legally inconsequential, admissions of her cotenants. The only possible effect of introducing their admissions was to improperly prejudice appellant's case in the eyes of the jury. Herein we in no wise run counter to anything said in *Hooper v. Bankhead*, 171 Ala. 626, 54 South. 549.

Application denied.

ANDERSON, C. J., and MAYFIELD, SOMERVILLE, GARDNER, and THOMAS, JJ., concur.